# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| **In re:** | |
| **JAMES PAUL COLLIER,** | ) |
| | ) |
|    **Debtor.** | ) |

| | | |
|---|---|---|
| **DEBRA LINSTROTH,** | ) | |
| | ) | |
|    **Appellant,** | ) | |
| | ) | No.: 3:07-cv-135 |
| v. | ) | (Phillips) |
| | ) | |
| **JAMES PAUL COLLIER,** | ) | |
| | ) | |
|    **Appellee.** | ) | |

## MEMORANDUM OPINION

On January 31, 2007, the Honorable Marcia Phillips Parsons, United States Bankruptcy Judge, entered a memorandum opinion and order holding that any debt owed by the debtor, appellee James Paul Collier, to the plaintiff, appellant Debra Linstroth, would not be excepted from discharge under either § 523(a)(2)(A) or § 523(a)(6) of the Bankruptcy Code. Linstroth timely appealed, and for the reasons that follow, this court affirms.

**I.    FACTS**

The facts in this case are heavily contested. Debtor/appellee James Paul Collier and plaintiff/appellant Debra Linstroth met in the parking lot of a grocery store in 2004. Collier was en route to a barrel race with his friend, Charles Wright, and his daughter. While Wright was inside

-1-

purchasing items for the race, Collier and his daughter waited in the parking lot, whereupon Linstroth noticed the horse trailer and horse that Collier and Wright were towing and approached them to chat. Linstroth, who trains horses, was trying to find a horse for her daughter. Likewise, Collier was looking for someone to teach his daughter how to ride. When Collier handed Linstroth his business card so she could contact him later, she noticed that he was in the construction business. Having wanted to improve her mobile home and surrounding property, Linstroth asked whether Collier would be able to complete the remodeling and other work she desired to have done. The parties dispute whether at this time Collier represented that he was a general contractor. Linstroth claims that Collier represented he was a general contractor, whereas Collier submits that at no point during the length of their relationship did he represent that he was a general contractor. Collier submits that he simply told Linstroth that he could do framing work and small remodeling jobs. In any event, the parties agreed that Collier would take a look at the property.

Having toured the property, Collier gave Linstroth an estimate of the cost of the project. The initial projection was approximately $50,000. After Linstroth indicated this was more than she either was willing to pay or could afford, the parties further negotiated. It was decided that another friend of Linstroth would complete the inside of the room addition, including wiring, insulation, sheetrock, carpet, and removal of the trailer wall, while Collier would only complete the frame and exterior. Collier would also receive a used horse trailer from Linstroth in return for a $1,000 credit. In all, Collier was to complete a room addition (shell only), new driveway, carport, barn, meter center, tack room, and arena with surrounding fencing, as well as brushhog a pasture and lay a slab for a basketball goal.

On June 7, 2004, the parties executed a written contract evidencing this agreement. The final

estimate for this construction was $36,720, to be paid as follows: $8,000 up front; $15,630 two to three weeks thereafter (after completion of the barn, tack room, and piers for addition); an additional payment of $10,000 one to six months thereafter; and the remainder of $3,080 to be paid upon completion. Linstroth wrote Collier a check for $8,000 the day the contract was signed. The following payments were somewhat behind, however: Linstroth paid $10,000 on June 17, 2004; $4,000 on July 13, 2004; and $14,320 on August 13, 2004.

Having begun various other parts of the project, Collier began work on the room addition. After completing roughly half of the work, however, a stop work order was issued by the Knox County Building Code Department on July 29, 2004, requiring a building permit to be obtained before construction could resume. According to Linstroth, Collier told her that he would take care of the permits. Collier, however, argues that he never said that he would obtain the building permits; rather, he had, from the beginning, made it clear that it was Linstroth's responsibility to obtain the permit. Linstroth, however, counters that he misrepresented these responsibilities as his own to fraudulently induce her to pay more money on the contract. Collier, did, however, further contact the board; having informed them of his building plans, Linstroth signed a letter in order for the permit to issue. On August 4, 2004, the Knox County Code Department issued the permit, albeit with the express provision that "[n]o modification of existing mobile home is allowed without sealed engineer design. No structure shall be supported by the mobile home."

At this point, the relationship began to sour. Linstroth claims she tried to contact Collier several times to no avail. At some point, however, Collier simply came to Linstroth's house. Linstroth alleges that Collier told her at this time that he would need the assistance of an architect and an engineer to complete the room addition, but that he had initiated negotiations via a sales

representative at his lumber supplier. Linstroth alleges that she offered Collier more money to help him obtain the drawings to complete the job, but that he acknowledged that it was his fault and that he would absorb the cost as a wage loss. Meanwhile, the project languished.

On August 13, Linstroth paid Collier $14,320. Linstroth alleges that Collier fraudulently induced her to make this payment by telling her that the price of lumber had increased and that he would need money to continue work. Linstroth knew Collier couldn't complete the job without sealed engineer's drawings and claims that he told her that with this payment, he would be able to obtain the drawings and finish the work. Linstroth further contends that she offered Collier even more money, but that he refused her offer, stating that he would absorb the difference as a loss on his own wages. Collier disputes this and contends that the payment simply covered overdue bills for work already completed.

When Linstroth made this last payment, she believed Collier would finish by September 1, 2004. After the stop work order was issued, however, Linstroth claims that the project in general continued to lie abandoned; in particular, no more work was completed on the room addition and the deck. She claims that Collier came to work solely on the tack room and barn. While Collier concedes that he told Linstroth that he would complete the room addition and deck, he contends that at the time of the last payment, he had yet to obtain the engineer's drawings, and therefore the completion had not been approved by the Knox County Building Code Department. Collier attributes this failure to obtain the requisite drawings, however, to the outstanding bills owed by Linstroth and his overall lack of cash flow. Collier testified that a business enterprise with a co-partner had collapsed, leaving him over $100,000 in debt.

In addition to the business relationship, the parties had established an apparent friendship.

Linstroth had been keeping Collier's horse and was responsible for the feeding, boarding, and care thereof. By Linstroth's accounts, when Collier next came to her property, it was not to complete the construction, but rather to retrieve his horse so he could sell it. Beyond his general business debts, Collier informed Linstroth at this point that his tools had been stolen and he could not complete the work without them. Nor could he simply obtain more tools, worth an estimated $36,000, due to his aforementioned financial insolvency. Linstroth alleges that she offered her help in any way, suggesting that she rent tools for Collier so he could complete the construction on her property. Collier, however, declined the aid, yet Linstroth alleges Collier assured her he had maintained her payments in a separate bank account and would complete the work as soon as he was financially able.

Collier, however, never completed the work. Linstroth contends that Collier told her that if she could find someone to complete the work, he would refund the price difference in the projects. Linstroth claims that very little of the project was finished, with much of it left in varying stages of disrepair. Collier, however, contends that he completed the driveway, carport, arena, and concrete slab for the basketball goal. The barn and tack room were almost complete, the former needing stall fronts and final electrical work and the latter needing electrical work and shingles on the roof. The meter center remained uncomplete. Debtor attributes any failures to complete the project to his financial insolvency.

The project encountered further problems as it sat uncompleted on the property. The roof of the mobile home began to leak through the bedroom and bathroom. Linstroth claims she had to buy tar and other supplies to patch the roof base. Linstroth likewise removed the siding and skirt herself, allegedly because Collier wouldn't remove it and recommended that she remove it herself.

Collier, however, contends that much of the damage to plaintiff's property, including the leaks, were attributable to Linstroth's tampering with the work he had already completed. Collier alleges that although parts of the project were not finished, he left the property in a state such that it would not be damaged; for example, he maintains he adequately sealed the roof such that it would not leak, but that Linstroth's tampering therewith was the sole cause of any subsequent damage.

On January 18, 2005, Linstroth filed suit in the Knox County Chancery Court. After the lawsuit commenced, Collier only visited the property when he had scheduled appointments. On October 12, 2005, Collier filed for bankruptcy.

## II. STANDARD OF REVIEW

Because "[t]he bankruptcy court's order regarding []dischargeability is a mixed question of law and fact[, t]he ... court reviews the conclusions of law de novo but the findings of fact under a clearly erroneous standard." *Aken v. Aken*, 320 B.R. 620, 622 (B.A.P. 6th Cir. 2005) (quoting *Mellon Bank, N.A. v. Vitanovich*, 259 B.R. 873, 875 (B.A.P. 6th Cir. 2001)). Under de novo review, this court will review the "questions of law independent of the bankruptcy court's determination." *Id.* (quotation removed). A factual determination will only be overturned if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation removed).

## III. ANALYSIS

### A. *Factual Determinations*

Much of the facts underlying this case were contested. Specifically, Linstroth and Collier

contest (1) whether Collier improperly used funds paid by Linstroth, (2) whether Collier misrepresented his expertise, (3) whether Collier represented he had a business license, (4) whether Collier told Linstroth that she would be responsible for obtaining the building permit, (5) whether Collier misrepresented construction costs, (6) whether Collier falsely represented that he would obtain the assistance of an engineer and architect to complete the project, and (7) whether Collier intended to consult an expert and complete the project once he had the proper funding. Judge Parsons found in Collier's favor on these issues, and this court will uphold these determinations as they are not clearly erroneous.

First, Judge Parsons determined that Collier did not improperly use funds paid by Linstroth. Linstroth alleges that Collier used her monies for projects other than hers, and that such use is prima facie evidence of fraud under Tennessee law. Judge Parsons, however, determined that the evidence does not support such an allegation. First, Collier testified that canceled checks totaling $27,263 were for materials and labor on Linstroth's behalf. He further testified that the difference between this amount and the total sums paid by Linstroth were for his own wages and profit. As Judge Parsons noted, no evidence in the record contradicted this testimony. Finally, Judge Parsons noted that there is no actual fraud under Tennessee law for failing to use a separate bank account.

This court is in agreement with Judge Parsons. As the bankruptcy court noted, there is no evidence in the record to contradict Collier's testimony, and this court will defer to Judge Parsons's determination that Collier was a credible witness. Nothing in the record leaves this court to believe that the finding was clearly erroneous, and as such, it is upheld.

Second, Judge Parsons made the legal conclusion that Collier did not intentionally or with gross negligence misrepresent his expertise. In so doing, Judge Parsons made the following factual

findings: that Collier did not tell Linstroth that he was a general contractor and that Collier had the skills to do the work. This court finds that these factual findings are not clearly erroneous. As Charles Wright testified, one does not need a special license or a general contractor's license to do remodeling work. [Doc. 1, Attach. # 27, at 203-05]. Further, as Judge Parsons noted, Collier had spent most of his adult life doing framing work and began such work when he was thirteen years old. [Doc. 1, Attach. # 27, at 129]. Collier had completed decks and other small remodeling jobs. Accordingly, these findings are not clearly erroneous.

Third, Judge Parsons found that there was no evidence that Collier represented he had a business license to practice as JPC Construction, Framing, and Remodeling. In support of this finding, Judge Parsons noted that Linstroth's first two checks were written to Collier personally, not his construction company. There is, however, some evidence in the record indicating that Collier represented he had a business license. First, Collier testified that he gave Linstroth a business card that said "JPC Construction, Framing, and Remodeling." [Doc. 1, Attach. #27, at 209]. Second, the heading of the contract listed "JPC Construction & Remodeling" as one of the contracting parties. [Doc. 1, Attach. #19].

Despite this evidence, the court is not left with the "definite and firm conviction that a mistake has been committed." *Aken*, 320 B.R. at 623. There is plenty of evidence in the record to support that Collier did not represent that he had a business license, the most important being the (initially) friendly nature of Collier and Linstroth's relationship. The court does not find that Collier would deem it necessary to represent that he had a business license to procure Linstroth's business and will therefore uphold the bankruptcy court's finding that Collier did not represent that he had a business license.

Fourth, Judge Parsons found that Collier told Linstroth that she would be responsible for obtaining the building permit, finding Collier's testimony credible that he had told Collier that she, as owner of the property, was responsible for obtaining the permit. This finding is supported by the record. Both Charles Wright and Collier testified that where the project is not under the supervision of a general contractor, obtaining the permit is the owner's duty. [*See* Doc. 1, Attach. # 19, at 199, 211-12]. Judge Parsons having found that Collier did not represent himself to be a general contractor, a finding which this court determines is not clearly erroneous, it follows that the owner was required to get the permit. Mere confusion as to whether Collier or Linstroth bore that responsibility is not equivalent to Collier affirmatively misrepresenting that he would obtain the permit. Accordingly, this court agrees with Judge Parsons's finding that Collier told Linstroth she would bear the responsibility of obtaining the proper building permit.

Fifth, this court is in agreement with Judge Parsons that Collier did not misrepresent the costs of construction. Judge Parsons found that Collier had simply underbid the project. This underestimate was not only a function of Collier's lack of experience, but was also driven by the nature of his relationship with the Linstroth. These findings are not clearly erroneous. The record supports that Collier simply underbid the project [*e.g.*, Doc. 1, Attach. #27, at 156], and the entirety of the record demonstrates that Collier and Linstroth had established a friendly relationship, such that Collier might be motivated to cut Linstroth a deal. Furthermore, rather than formally calculate a bid, Collier simply ran through quick calculations while surveying the property with the Linstroth. [*E.g.*, Doc. 1, Attach. #27, at 135, 137]. Finally, Charles Wright, a friend of Collier who also works in the construction business, testified that prices in the construction world fluctuate greatly day-to-day. [Doc. 1, Attach. #27, at 195-98]. Although this is normally accounted for by specific clauses

in the contract, [*see id.*], due to his lack of experience, Collier did not provide such clauses in the contract. Accordingly, this court is in agreement with Judge Parsons that Collier simply miscalculated the costs of construction due both to inexperience and his friendship with Linstroth, rather than affirmatively misrepresented costs with the intent to deceive her.

Sixth, the bankruptcy court found that Collier did not falsely represent that he would obtain the assistance of an engineer and architect as an inducement for Linstroth to make the final payment. Judge Parsons held that the evidence did not indicate that Collier told Linstroth he would use the money for such purposes. Rather, the evidence indicated that Collier told Linstroth that he had material bills outstanding. It was undisputed, as Judge Parsons noted, that $10,000 of the $14,320 paid in the final check was outstanding under the contract. These findings are not clearly erroneous, as the transcript is replete with evidence of the misunderstandings underlying this dispute. The court will defer to Judge Parson's determination of the credibility of each witness.

Finally, Judge Parsons found that Collier intended to consult an expert and completely finish all work as soon as he had the financial resources. In support, Judge Parsons found that on September 22, 2004, the parties met, at Collier's request, with Wayne Williamson of the Knox County Building Codes Department in order for him to explain the building code's directive. Furthermore, until his tools were stolen, Collier continued work on the rest of the projects while he attempted to raise money to finish the room addition. Finally, even after these legal proceedings commenced, Collier met on two occasions with Linstroth and her counsel to try to salvage the construction.

This court agrees with Judge Parsons. While Linstroth argues that Collier was simply attempting to finish the construction because of fear of being sued, nevertheless the record indicates

that Collier regarded Linstroth as a friend and attempted to assist her with this project because of that friendship. The record indicates other ways in which Collier helped Linstroth—caring and feeding her horses when she was out of town, repairing her car—and it does not appear that he would simply abandon the work and leave her without any other recourse.

These factual underpinnings affect this court's legal conclusions, which the court will discuss next.

### B. *Conclusions of Law*

Based on these factual findings, Judge Parsons concluded that Collier's debts to Linstroth were dischargeable because they were not subject to exception under § 523(a). In making these broader legal conclusions, Judge Parsons specifically found that Collier did not intentionally or with gross negligence misrepresent his expertise, nor did he act with gross negligence by failure to check the building codes or doing further investigation to verify his initial price quote. Accordingly, the debt was dischargeable as not excepted under § 523(a)(2)(A). Further, Judge Parsons found that no evidence indicated that Collier deliberately or intentionally injured Linstroth or believed Linstroth would be injured, and the debt was therefore dischargeable as not excepted under § 523(a)(6).

Section 523(a)(2)(A) provides,

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (2006). Section 523 (a)(6) provides, "A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." *Id.* § 523(a)(6).

This court must review the bankruptcy court's legal conclusions de novo. After a careful review of the record and having articulated bases for the factual findings above, this court finds that further explanation would be unnecessarily duplicative. Accordingly, this court affirms the bankruptcy court's legal conclusions of law for the reasons given by the bankruptcy court.

**IV. CONCLUSION**

It appears that this dispute resulted from a series of misunderstandings and the mingling of business and friendship. While the court is certainly sympathetic with the financial state in which this has left Linstroth, such misunderstandings do not rise to the requisite level of fraud or maliciousness for the debt to be nondischargeable under 11 U.S.C. § 523(a). This court is therefore fully in agreement with the well-reasoned opinion of Judge Parsons. Accordingly, the judgment of the bankruptcy court [Memorandum and separate Order of January 31, 2007] is **AFFIRMED**.

**IT IS SO ORDERED**.

**ENTER:**

s/ Thomas W. Phillips
United States District Judge